Ralph Dale BASS, Petitioner,

v.

Louie L. WAINWRIGHT, Respondent.

No. 80–249–ORL–CIV–06.

United States District Court,
M.D. Florida,
Orlando Division.

June 13, 1983.

John D. Middleton, Gainesville, for petitioner.

Evelyn D. Golden, Asst. Atty. Gen., State of Fla., Daytona Beach, Fla., for respondent.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Senior District Judge.

This cause is before the Court on petition by Ralph Dale Bass for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

On July 18, 1975 a state grand jury returned a two-count indictment charging petitioner and co-defendant Gary Wilson with

first degree murder for the unlawful killing of Jeffrey Saure and David Palmer. Prior to trial petitioner moved to suppress his confession.[1] Judge Muszynski, Orange County Circuit Court Judge, held a suppression hearing on December 15, 1975. At the conclusion of the hearing Judge Muszynski denied petitioner's motion to suppress after stating:

"[u]pon the evidence presented, the court finds and determines that the confession of the defendant was freely, voluntarily, and intelligently made, and after he had been fully advised of his constitutional rights." (Transcript of Suppression Hearing, at 86, December 15, 1976.)

On December 16, 1975 Bass entered a plea of nolo contendere to both first degree murder charges, specifically reserving the right to appeal the trial court's denial of the motion to suppress the confession. Judge Muszynski adjudicated petitioner guilty and sentenced him to two twenty-five (25) year terms, to be served concurrently. On appeal, the trial court's denial of Bass' motion to suppress was affirmed. *Bass v. State,* 351 So.2d 426 (Fla. 4th DCA), *cert. denied,* 354 So.2d 978 (Fla. 1977).

Following exhaustion of state remedies, Bass filed two petitions for writ of habeas corpus, claiming in each that his confession was obtained in violation of his constitutional rights. Judge John A. Reed, Jr. dismissed the first petition for failure to state a claim on which relief can be granted. Bass did not appeal Judge Reed's ruling. This Court dismissed Bass' second petition ruling that the prior determination was on the merits. The Eleventh Circuit Court of Appeals reversed and remanded the case to this Court to afford Bass an opportunity to explain why he did not appeal the dismissal of his first § 2254 petition. 675 F.2d 1204, 1206 (11th Cir.1982).

On remand, this Court determined that petitioner should be allowed to proceed on the merits with his application for writ of habeas corpus and held an evidentiary hearing on February 15, 1983.

### I.

Bass confessed that he and Gary Wilson, his co-defendant, had agreed to steal some marijuana from Jeffrey Saure. Bass had bought marijuana from Saure several times before but Wilson and Saure did not know each other. According to Bass[2], he was to arrange to buy twenty-five pounds of marijuana from Saure at Saure's home. While Bass was completing the deal, Wilson was to wait outside. After Bass left Saure's home, Bass was to make some excuse to get back into the house. Wilson was to follow him back into the house and hold a gun on everyone, including Bass, whom he would pretend not to recognize. Wilson would then tie them all up and take their money and marijuana. Bass was to meet Wilson later to collect his share.

In addition to confessing to the foregoing, Bass gave the following account of the August 21, 1974 murders. David Palmer was present with Saure at Saure's home when Bass arrived. Bass and Palmer had never met before. Events went as Bass and Wilson had planned until Wilson followed Bass back into the house. Just as Saure and Palmer saw Wilson, Wilson opened fire, hitting Saure and Palmer. Saure and Palmer fell to the floor, but they were still alive so Wilson proceeded to shoot one of them and hit one on the head with a hammer. Wilson and Bass loaded the marijuana into a car and left. Wilson later gave Bass twelve and one half pounds of marijuana for his part in the robbery. (Transcript of Interview conducted by Lt. Blankenship and Detective Nazarchuk, at 3–6, July 7, 1975.)

---

1. Bass moved to suppress statements made to Sheriff's officers on January 15, 1975, July 3, 1975 and July 7, 1975.

2. The files reveal that the only account of Bass and Wilson's robbery plan contained therein was supplied by Bass. This Court is also obliged to rely on Bass' version of the murders since Bass did not go to trial and the record in this case contains no statement by Wilson.

Saure and Palmer were found dead later that day at the murder scene.[3] Bass claims that in the course of the robbery he had not planned to shoot anyone and did not know that Wilson would. Bass also claims that he was afraid to stop Wilson during the killings because he feared Wilson would shoot him.

The police knew Bass was a friend of Saure and in September of 1974, the officers of the Sheriff's Department of Orange County, Florida approached Bass asking him if he had any information about the murders. Bass accompanied the officers in the Sheriff's car to the 33rd Street Station and was questioned. At that time Bass told the officers that he had been at the murder scene prior to the murders but left before the murders took place. After this first interview, over the next three months, officers contacted Bass repeatedly at his home asking for more information on the August murders.

On January 15, 1975 Bass again accompanied the law enforcement officers to the sheriff's office. It is undisputed that Bass was given no *Miranda* warning before he was questioned. During his January 15, 1975 statement Bass again admitted being at the murder scene prior to the murders and admitted he was a friend of Wilson.

On July 3 and 7, 1975, for the first time, Bass was given his *Miranda* warnings and then proceeded to give statements to officers of the Sheriff's Department. At the time he made these statements Bass was in custody, having been arrested on July 3 for possession of stolen property. On that date Bass again stated that he was at the murder scene prior to the murders but gave no further inculpatory statement. Bass first admitted to his participation in the crime on July 7, 1975.

In support of his request for habeas relief petitioner contends that the trial court erred in denying the motion to suppress in that his confession was involuntary for the following reasons:

1) Bass was given no *Miranda* warning on January 15, 1975 and subsequent statements in July lead from the January statement;

2) Bass was under the influence of drugs at the time of his confession;

3) The Sheriff's officers promised him immunity and told him that Wilson had "fingered" Bass as the actual murderer;

4) Bass' attorney advised him to cooperate; and

5) That petitioner's trial counsel, Charles Trulock, did not testify at the suppression hearing, even though it is alleged that he should have and may by such failure have prejudiced the petitioner.

In response to the merits of the petition, respondent contends that the record in this case clearly supports the trial court's finding of a voluntary confession.

II.

At the hearing on petitioner's motion to suppress Bass testified and called Stan Bass, his brother, as a witness. The state called as witnesses the investigating sheriff's officers, Lt. Blankenship and Detective Nazarchuk, in support of its position that petitioner's statements were voluntarily made. During the hearing Nazarchuk played a thirty minute tape of Bass' July 7, 1975 interview.

Blankenship and Nazarchuk testified that on July 7, 1975 Bass was twice advised of his constitutional rights and then in response to Bass' request for immunity, Blankenship told him:

"... if you were not involved in the killing and if you didn't pull the trigger

---

**3.** The Orange County Medical Examiner was called to the murder scene and examined the bodies at around midnight on August 21, 1974. The medical examiner noted that Saure's body contained several gunshot wounds, abrasions caused by a telephone cord around the neck and stab wounds. Death was caused by either a stab wound or gunshot wound of the chest or both. (Transcript of Plea Proceedings and Sentencing, at 38–40, December 16, 1975.) Palmer's body contained gunshot wounds and lacerations to the back of the head. The cause of death was a gunshot wound to the head. *Id.* at 27–29.

and didn't assist the man in the killing of these people or participate in any way or gain from or help carry stuff from the house or get things from the house, then, you would not be, if you only suspect Gary Wilson, but you weren't there when it took place, you wouldn't be charged. But, if you were there, then you would be." (Transcript of Suppression hearing, at 76, December 15, 1975.)

Bass testified that Blankenship told him, "Dale, as long as you didn't actually kill one of the boys or hold one of them down while Gary killed them, I won't charge you with it." *Id.* at 61.

Bass testified that the officers also informed him that Wilson had "fingered" Bass as the actual murderer. Under cross examination by the state attorney, Bass testified:

A. Yes, sir. No, sir, that is not all he told me either. He told me that Gary had already told them that I killed both of the guys.

Q. Is that when you decided then that you would tell them that you were there?

A. After they had promised me that, yes, sir.

Q. After they told you that Gary had already put it on you?

A. After that and after they told me I wouldn't be charged with it because I didn't actually kill one of the guys. I had no part of it.

Q. You were advised that Gary's version was a little different than that?

A. Sir?

Q. You were advised that Gary's version was somewhat different that that, were you not?

A. Yes, sir.

*Id.* at 66.

Blankenship testified that he did not tell Bass that Wilson had implicated Bass. Under Trulock's cross-examination, Blankenship testified:

A. I never talked with Gary Wilson.

Q. Were you aware of any transcribed or recorded statement of other deputies talking to Gary Wilson about this homicide?

A. I sent two men to see Gary Wilson. I have no knowledge of what he said at that time.

Q. Did you, on the 7th, tell Dale Bass that Gary Wilson had told them everything that had happened and told you that Dale was the one who had actually pulled the trigger and killed these people?

A. No, sir.

*Id.* at 21.

Bass testified that on July 7, 1975, he tried to call Mr. Trulock, an attorney who had previously represented him on another matter, but Trulock was not in his office. Apparently Bass then confessed to his involvement in the murders, but this first statement was not taped. Later, on the same day, after speaking to Trulock, Bass repeated the same story for the tape. At the suppression hearing, Trulock asked Detective Nazarchuk:

Q. You say that on the 7th that before making any statement, he asked to contact an attorney?

A. He said he wanted to make a phone call, sir. At that time, I told him to go ahead. He wanted a phone book. I gave him the phone book. I think at this point, Lieutenant Blankenship mentioned your office, sir.

Q. All right. Did he get to talk with an attorney?

A. He spoke with somebody on the phone. I don't know who.

Q. After that, did he begin to make a statement?

A. I believe after the second call, he sat down and made a statement.

Q. The first statement was not taped?

A. No sir. It was an oral statement.

Q. He told the same story that he told on the tape?

A. I believe so, sir.

*Id.* at 50–51.

Trulock then asked Bass:

Q. Did you make a statement prior to talking to me, an oral statement that was not taped?

A. I think so.

Q. Did you tell them at that point everything that you told them in this taped statement?

A. No.

Q. How far did you go?

A. Well, I told them that I didn't want, you know—I am not sure. I am not really sure.

Q. You told them the whole story?

A. I could have. I don't believe so.

*Id.* at 62.

At the suppression hearing Bass acknowledged that Trulock was not representing him on July 7, 1975. Trulock asked Bass:

Q. Did I explain to you that I was not your attorney at that time?

A. You explained that you were not my attorney. You asked me if I had any money. I said I didn't have any money. You said that unless I could come up with some money, you could not act as my attorney.

*Id.* at 62–62.

During a bench conference Trulock stated:

"I do recall the telephone conversation in which he [Bass] told me that Blankenship told him that as long as he didn't commit the murders that he would not be charged with it. I asked him if he had anything to do with it. He said no. He also told me that he had already given an oral statement. I told him at that time ·he should cooperate with them. I want it made clear that at that time I was not representing him and it was not any information or advice to him as his attorney, but some street advice that if he felt like they were not going to charge him if he told them the truth, that is what he

should do. I don't know whether we are getting into a conflicting situation."

*Id.* at 73.

The officers testified that after speaking with Trulock, Bass proceeded to give another statement which they taped.

Nazarchuk testified that some time between January 15, 1975 and July 3, 1975 Bass had complained to him of "withdrawal pains." *Id.* at 46. Lieutenant Blankenship testified at the suppression hearing that Bass did not appear to be under the influence of drugs on July 3 or July 7, although, quite understandably, Bass did seem to be nervous when he finally confessed on July 7. During the suppression hearing, Trulock asked Blankenship about Bass' physical condition on July 3:

Q. What about his physical condition?

A. Appeared to be okay to me.

Q. Mental condition?

A. Appeared to be okay.

Q. Did he appear to be under the influence of any drugs or intoxicants?

A. No, sir.

Q. Did you inquire as to whether or not he had recently used any drugs or intoxicants?

A. Yes, sir.

Q. What was his answer?

A. He said that he was a heroin addict, and he had been cured and was no longer involved with any dope of any kind. He said he was completely off of it.

Q. Did you determine when was the last time he had taken any heroin or any other drugs or narcotics?

A. No, sir. But, I can't remember whether he told me—it seems to me like it was in 1974, the last time he had anything to do with it.

*Id.* at 18–19. Trulock then inquired about Bass' physical condition on July 7:

Q. What was his mental condition on that day?

A. It appeared to be good except when he was getting down and telling us

about the actual killings themselves. He broke down and started crying.

Q. Did he appear to be nervous?

A. Yes, sir, he was little nervous.

Q. Shaky?

A. He appeared to be shaky, yes.

Q. Who all was present when he gave the statement?

A. Detective Nazarchuk.

*Id.* at 24.

### III.

28 U.S.C. § 2254(d) provides:

"In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct*, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or, unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, *the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.*" (emphasis added)

■ This statute prescribes a two-step determination. The State court finding is "presumed to be correct" unless one or more of the eight defects set forth in 28 U.S.C. § 2254(d) appear. Once the State court finding is "presumed to be correct" the burden shifts to the petitioner to prove by "convincing evidence" that the State finding was not correct. *Thomas v. Zant*, 697 F.2d 977, 985–987 (11th Cir.1983). 28 U.S.C. § 2254(d) "requires the federal courts to show a high measure of deference to the fact findings made by the state courts." *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480, 487 (1982).

■ After reviewing the transcript of the suppression hearing, all pleadings, in-

cluding the lengthy appendices which petitioner and respondents have attached thereto, and after consideration of the testimony and oral argument presented at the federal evidentiary hearing, this Court finds that petitioner was afforded a full and fair hearing by the State court and none of the circumstances set forth in paragraphs (1) thru (8) of 28 U.S.C. § 2254(d) have been established. Therefore, under 28 U.S.C. § 2254(d), Judge Muszynski's finding is presumed to be correct. Now the burden shifts to Bass to show by convincing evidence that the State court factual finding that Bass' confession was voluntary was erroneous.

#### IV.

At the federal evidentiary hearing Bass called three witnesses, Charles Trulock, Russ Calamia, a former deputy sheriff, and Stan Bass, petitioner's brother. The state called no witnesses, relying instead on its answer to petitioner's petition for writ of habeas corpus filed in this cause and the lengthy appendix attached thereto.

According to Bass' own testimony, he was very familiar with the criminal justice system at the time of his statements in 1975. Bass stated that he had been a confidential informant for the police on a number of drug deals and transactions in stolen property and the police had never "double crossed" him before. Bass admitted that he was breaking the law at the same time he was a confidential informant even though a condition of being a confidential informant was that Bass not continue to deal. On July 3, 1975, when Bass was arrested for possession of stolen property, he was still on probation for a breaking and entering felony charge. Before this Court Stan Bass testified that on July 3 officers at the Orlando Police Department told him (Stan) that he should talk to petitioner and tell petitioner that he should cooperate. Stan testified that he told petitioner what the officers had said and petitioner replied "don't pay any attention." Stan also testified that petitioner was going through "severe withdrawals" on that date.

Trulock testified at the federal evidentiary hearing that even though he didn't know the extent of Bass' involvement in the murders, he advised Bass to cooperate if Bass "didn't do it." Trulock admitted that he did not explain to Bass all the ramifications of the phrase "didn't do it." Trulock also testified that it is not his standard operating procedure, when a client calls from jail, to tell the client to cooperate with the police.

#### V.

■ Determination of the voluntariness of a confession rests on "whether under the 'totality of the circumstances' the statements are the product of the accused's 'free and rational' choice." *Martinez v. Estelle*, 612 F.2d 173, 177 (5th Cir.1980) (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968)). In an *en banc* decision, the Fifth Circuit recently stated, "in order to find [defendant's] confession voluntary, we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Jurek v. Estelle,* 623 F.2d 929, 927 (5th Cir.1980) (*en banc*).

#### MIRANDA WARNING

The first ground raised by petitioner in support of his petition is that he was given no *Miranda* warning even though he was in custody on January 15, 1975 and this failure to advise him of his constitutional rights tainted subsequent statements he made in July. The facts show that, although Bass admitted he had been at the murder scene prior to the murders, he continuously denied any involvement in the murders from the first time he was questioned in September of 1974 up to the time of his confession on July 7, 1975. From sources other than Bass, the police knew that Bass had been a friend of one of the victims, Jeff Saure. Bass' January statement added nothing to the information that the officers had gleaned from previous in-

terviews except his statement that he knew Wilson. Furthermore, Bass was consistent in his denial of any involvement in the murders up until the time he confessed. So his confession was not tainted by prior pre-*Miranda* warning statements.

## DRUG ADDICTION

The second ground raised in support of the present petition is that Bass' confession was involuntary because he was so under the influence of drugs that he was not able to make "an independent and informed choice." Bass claims that his confession was not voluntary because he was a drug addict during the time his statements were taken and the police knew of his condition. At the suppression hearing Blankenship testified that Bass did not appear to be under the influence of drugs on July 3 or 7. At that same hearing, Judge Muszynski listened to the tape of petitioner's July 7 confession and had the opportunity to hear live testimony of petitioner, Stan Bass, and Blankenship. As previously noted, Judge Muszynski held that petitioner's confession was voluntary, which implies a finding that Bass was not under the influence of narcotics to an extent to make his confession involuntary.

## PROMISE OF IMMUNITY AND CONFESSION OF CO-DEFENDANT

In Part I of this opinion it is noted that Bass and the sheriff's officers gave different accounts of the "promise of immunity" which Bass claims he received from the officers. Briefly stated, Bass claims he confessed because he was lead to believe that he would not be charged if he had not held one of the victims down or actually killed one of them, while the officers state they told Bass he would not be charged if he in no way participated in the murders. The officers emphasize that they gave Bass his *Miranda* warnings twice on July 3 and twice on July 7. On July 3 when Stan Bass was urging petitioner to cooperate, petitioner's answer, "don't pay any attention"

would seem to indicate that at that point petitioner was not seriously thinking of cooperating with the police.

At a suppression hearing, when the two sides give different accounts of factors central to the determination of whether defendant's confession was voluntary, it is the task of the fact finder to consider the evidence, judge the credibility of witnesses and then make a determination. Judge Muszynski had the advantage of hearing the above cited testimony and having the witnesses in front of him. Obviously, by his ruling, Judge Muszynski determined that Bass was not pressured into confessing because of promises of immunity or a false belief that his co-defendant had implicated Bass. Testimony presented at the evidentiary hearing before this Court did not differ in any significant way from testimony heard at the suppression hearing before Judge Muszynski.[4]

## BASS' ATTORNEY ADVISED HIM TO COOPERATE

Bass' fourth claim is that his confession was not voluntary because his attorney advised him to cooperate. First of all, it is not clear that Trulock was representing Bass on July 7. At the federal evidentiary hearing Trulock testified that he had represented Bass prior to August of 1974 on a burglary charge in Bonifay, Florida. Trulock also testified that prior to July of 1975, Bass had called Trulock and informed him that officers were continuing to ask him information about the August 1974 murders. Trulock suggested to the officers that they either charge or subpoena Bass rather than continue to interview him. At the state suppression hearing, Bass testified that Trulock had told him that he, Trulock, was not Bass' attorney at the time. During a bench conference Trulock emphasized to Judge Muszynski his belief that he was not representing Bass on July 7 and was only giving Bass some "street advice."

---

4. Of course, as previously noted herein, no live testimony was adduced from the officers who testified before State of Florida Circuit Court Judge Muszynski.

On July 7, before making any statement, Bass attempted to call Trulock but was unsuccessful. Bass then gave some sort of "statement" to the police. At the suppression hearing Bass testified that he was not sure, but could have told the officers the "whole story" at that time. Nazarchuk testified that Bass did confess before he tried to call Trulock the second time.

Although Trulock's advice to Bass that Bass should cooperate if he "didn't do it" was not even very good "street advice" in light of Trulock's incomplete knowledge of the matter, that advice was only one of many factors which must be considered. Bass was very familiar with the criminal justice system and was well aware of his *Miranda* rights even before the officers read his rights to him twice on July 7. Even though Bass knew that he had a right to remain silent, he proceeded to give a "statement" before he managed to talk to Trulock. In addition, Bass knew that Trulock was claiming that he did not represent Bass at the time and that Trulock had told him to give the taped statement "if he didn't do it."

### FAILURE TO TRULOCK TO TESTIFY AT SUPPRESSION HEARING

The principal possible infirmity to the state suppression hearing is grounded in the claim of the petitioner that his attorney, Trulock, represented him at the hearing and should have testified, but was unable to do so because of the fact that he was representing petitioner at the hearing. At the federal evidentiary hearing before the undersigned judge, Trulock was called as a witness [5] and did testify, as previously noted in this opinion. As a result, this Court concludes that nothing new was adduced that was not already before Judge Muszynski at the time he made his ruling on the motion to suppress and that therefore no prejudice resulted from the failure of Trulock to testify at the suppression hearing. Accordingly, it would seem to be an unnecessary and useless act to return this case to the state trial judge for an additional hearing for the purpose of hearing the testimony of attorney Trulock.

This particular claim also seems to raise for consideration a contention of ineffective assistance of counsel at the suppression hearing. In *Washington v. Strickland*, 693 F.2d 1243 (5th Cir. Unit B 1982) the en banc court held (p. 1258):

> "We decide that the petitioner has the burden of persuasion to demonstrate that the ineffective assistance created not only 'a *possibility* of prejudice, but that (it) worked to his *actual* and substantial disadvantage'. See *United States v. Frady*, 456 U.S. 152, 170–71, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original)."

Even assuming that attorney Trulock's representation constituted ineffective assistance of counsel because he did not testify, the petitioner has not carried his burden of demonstrating that such ineffective assistance worked to his actual and substantial disadvantage.

### CONCLUSION

After considering all the evidence relating to the five grounds raised by petitioner, this Court determines that petitioner has not shown by convincing evidence that Judge Muszynski's finding that Bass' confession was voluntary was erroneous.

In summary, this Court has followed the two-step procedure mandated by 28 U.S.C. § 2254(d) in considering Bass' application for writ of habeas corpus. After reviewing the entire record and affording petitioner an evidentiary hearing, this Court concludes that the state court finding must be presumed to be correct since that finding in no way suffered from any of the eight listed deficiencies of Section 2254(d). Petitioner has failed to show by convincing evidence that the state court was erroneous in its finding that his confession was voluntary. Accordingly, petitioner's application for writ of habeas corpus will be denied.

---

**5.** Petitioner had new counsel at the federal evidentiary hearing.